Argued July 6, reversed and remanded November 30, 1972

McDONALD, *Appellant, v.* HANNESON ET AL, *Respondents.*

503 P2d 674

*Max S. Taggart, II,* Springfield, argued the cause for appellant.

*Richard Bryson,* Eugene, argued the cause for respondent.

McALLISTER, J.

This is an action for wrongful death. The jury returned a verdict for defendants and plaintiff appeals. The issue is whether the trial court erroneously instructed the jury on assumption of risk.

Londa Faye Sorrells drowned on August 3, 1969, in Siltcoos Lake. She had been water skiing with a group of young people, including her sister Mary, Melody Casey and defendants Michael Hanneson and Dennis Cole. The party was using a boat owned by Michael Hanneson's grandparents, the defendants George and Dorothy Nelson. A dock extended into the lake from the north shore and about twenty feet beyond the end of the dock there was anchored a small swimming float, also referred to as a dock in the testimony, about eight feet square with a diving board attached.

After water skiing for some time Londa and Melody asked to be let out of the boat and were let out onto the swimming float. Dennis Cole testified:

"Q   What were the two girls doing on the dock? What were they going to do on the dock?

"A   Londa said she wanted to swim for awhile.

I asked if they would all stay in the boat until we were done and we could leave. And then she said, 'Well, we will just sunbathe, then. So I let them . . . I went ahead and pulled over and they got out.

"Q   But she indicated that she wanted to swim, did she?
"A   Yes."

Londa and Melody then remained on the swimming float while the rest of the party continued to ski. Mary Sorrells took a turn at skiing, then got into the boat and acted as observer or "spotter" while defendant Hanneson skied and defendant Cole operated the boat. The tow rope was approximately 75 feet long. While Hanneson was skiing Cole made two circular passes in a counter clock-wise pattern, which brought the boat and skier near the swimming float. On both passes the boat passed the float traveling from east to west. On the first pass Hanneson skied close enough to the float to spray water onto the girls as they sat on the north or shore side of the float. On the second circular pass the boat came closer to the float than on the first pass. The evidence is conflicting as to just what happened at that time. Hanneson testified that he was attempting to come in and land near the east side of the float. Mary Sorrells and Cole testified that Hanneson signaled his intention to come in. There was, however, evidence from which the jury could have found that Hanneson swung to the north of the swimming float and into the area between the float and the stationary dock, a maneuver which would have caused the tow rope to pass directly over the swimming float.

A state policeman, who investigated the tragedy,

testified concerning his on-the-scene conversation with Hanneson as follows:

"Q Tell the jury what Mr. Hanneson told you.

"A He had been skiing behind this boat. They had made one big swing in towards the dock passing on the south or the outside of it, headed from east to west. They made a big loop around the lake down to the south and returned back, and the boat came in fairly close to the dock and Mr. Hanneson, who was on skis behind it, swung in between the floating dock and the end of the long dock which was sticking up towards it from the shore line.

"Q You said he swung in between the two docks, did he?

"A Yes, sir.

"Q And what did he say why he was doing that?

"A He was preparing to unload and it was his intention as he got there, or so he said at the time, that he tried to flip the rope up over the head of Londa Sorrells who was standing on the dock. He was unable to do so and—

"Q Did he say why he was unable to flip the rope over her head?

"A No, sir, he did not.

"Q What did he say happened?

"A He said that the rope came in contact, he said it appeared to come in contact with her legs. At this time he flipped the handle and let go of it. He couldn't raise it over her head.

"Q What did he say happened after the rope hit the girl and he let go of it?

"A He didn't see what occurred at that particular time. According to him, then, he was on the skis and sitting into the water. First that he knew

that anything serious had gone wrong at the time, as he stated, was when the boat stopped out there and there was a lot of yelling.

"I don't know how he was informed of what had happened, but he observed then that she had been apparently pulled off the dock."

The testimony of several eyewitnesses tends to corroborate the description of the accident as related by Hanneson to the state policeman. One of those witnesses, Mary Sorrells, illustrated her testimony by locating the boat off the southwest corner of the float and the skier off the northeast corner of the float with the rope extending diagonally across the float between them. She said the boat and skier were in that position when Hanneson released the rope. Other eyewitnesses corroborated Mary Sorrells' testimony concerning the relative position of the boat and skier when the rope "snaked" across the float.

The defendants alleged in their answer that Londa "assumed the inherent risks of harm from the tow rope by engaging in the sport of water skiing." At the request of the defendants the trial court instructed the jury as follows:

"In connection with the defendants' contention of their affirmative defense of assumption of risk, I instruct you that those engaged in water-skiing must be held to have assumed the normal risk of injury incident to that sport.",

to which plaintiff duly excepted.

■ We think the giving of the above instruction was clearly erroneous and prejudicial. The evidence was uncontradicted: (1) that Londa had withdrawn from the activity of water skiing and was waiting on the swimming float until the rest of the party was

ready to quit; and (2) she was not injured by any normal risk inherent in water skiing.

The dragging of the tow rope across the float was the cause of Londa's death. There was no evidence that Londa knew that Cole intended to operate the boat or that Hanneson intended to ski so that such a result might occur. There is no evidence that such a maneuver had been engaged in by Hanneson and Cole or by any other skier on this outing or on any other. In other words, there is no evidence that the risk inherent in such a maneuver was a normal risk inherent in water skiing. Neither is there any evidence that a person standing on a float which is being used as the base from which water skiers take off and land is in any danger of becoming entangled in a tow rope.

Since Londa was completely unaware that Cole and Hanneson would cause the rope to pass over the float she could hardly assume the risk inherent in that maneuver.

Defendants Cole and Nelson contend that there was no evidence that they were negligent and, therefore, if the assumption of risk instruction was erroneous a new trial should be limited to the question of Hanneson's liability. As to defendants Nelson the question of their liability was submitted to the jury on the theory of the family purpose doctrine. The jury was instructed that as the owners of the boat the Nelsons would be liable if they maintained the boat for family use and the injury was caused by the negligent operation of the boat while it was being used by a member of the family or by another person with the permission of a family member. Michael Hanneson is the grandson of the Nelsons and was living with them

at the time of the accident. Defendants do not contend that the family purpose doctrine was inapplicable under the circumstances. Since we hold for the reasons hereinafter stated that the jury could have found that defendant Cole was negligent and that his negligence caused or contributed to Londa's death, the question of the liability of the Nelsons was properly submitted to the jury.

The following allegations of negligence on the part of Cole were submitted to the jury: (1) excessive speed; (2) failing to maintain a proper lookout; (3) operating the boat so that it traveled on one side of the swimming float while the skier was on the other side; and (4) operating the boat "in a manner by which the direction of the water skier was controlled so as to cause the rope tow to collide with and strike the deceased."

■ We think there was evidence from which the jury could have found that the speed and direction in which the boat was operated contributed in some degree to cause the rope to pass over the float. Cole testified that the boat was being operated at its maximum speed as it swung by the dock to let Hanneson off. The jury could have found that if the boat had approached the dock at a slower speed Hanneson could not have swung far enough to the north to bring the rope over the float. It is not clear from the evidence how close Cole brought the boat to the swimming float on the second pass, but everyone agreed that it was closer than on the first pass. Mary Sorrells testified that the boat was as close to the swimming float as the counsel table in the courtroom was to the first row of the jury. Such evidence was, of course, more meaningful to the jury than it is to this

court on review. Hanneson testified that a skier is "controlled to a certain extent" by the boat that is pulling him and further testified as follows:

"Q So, is it your testimony that had you been farther away from the dock that the rope could have never got on the dock and caused what it caused to happen?

"A No. But I couldn't have—couldn't have landed, you know, where I usually do if we were out farther."

Whether Cole should have kept the boat farther from the swimming float or approached at a slower speed and whether his failure to do so contributed to the accident were typical jury questions. We cannot hold as a matter of law that there was no evidence of negligence on the part of Cole.

The judgment of the trial court is reversed and the case remanded for a new trial.